UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------x

MAKE THE ROAD STATES, COMMON CAUSE, and ELECTRONIC PRIVACY INFORMATION CENTER,

Plaintiffs,

-against-

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health and Human Services et al.,

Defendants.

-----------------------------------x

**MEMORANDUM & ORDER**
26-CV-4713 (EK)(CHK)

ERIC KOMITEE, United States District Judge:

On June 23, the U.S. Department of Health and Human Services published a notice in the Federal Register. The notice indicated that HHS intends to conduct integrity reviews of the Temporary Assistance for Needy Families program. To that end, HHS plans to share data collected from TANF recipients and their families with other agencies and entities engaged by HHS to assist with integrity reviews and projects.

Plaintiffs are three non-profit organizations, two of which have members who are current or former TANF recipients (or their household members) and would allegedly be impacted by any data sharing. Plaintiffs claim that the TANF Notice violates the federal Social Security and Privacy Acts, is arbitrary and

capricious, and was issued without observance of the required procedures.

Before the Court is plaintiffs' motion for a preliminary injunction and / or a stay of the TANF Notice under Section 705 of the Administrative Procedure Act. *See* Oral Arg. Tr. 65:8-11, ECF No. 21 ("THE COURT: . . . [W]hat would the injunction do beyond the 705 stay? Nothing. [PLAINTIFFS' COUNSEL:] Nothing. They really converge."). For the reasons that follow, the motion is denied.

## I. Background

The Court draws the following facts from the complaint, as well as the declarations and exhibits attached to plaintiffs' motion. *See Real Est. Bd. of N.Y., Inc. v. City of New York*, 786 F. Supp. 3d 788, 815 (S.D.N.Y. 2025) ("In deciding a motion for preliminary injunction, a court may consider the entire record . . . .").[1] All facts discussed herein are undisputed unless otherwise noted. *See Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) (party seeking preliminary injunction "is not entitled to have the court accept its untested representations as true if they are disputed").

[1] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

### A. The TANF Program

Temporary Assistance for Needy Families ("TANF") is a federal block-grant program that provides over $16 billion in funding each year for states — as well as the District of Columbia, territories, and tribes — to establish financial assistance programs for low-income families with children. Compl. ¶¶ 25-28, ECF No. 1; *see also* 42 U.S.C. §§ 601-619 (the TANF statute). TANF "helps fund a range of state-administered benefits and services," including cash assistance. Compl. ¶¶ 28-29. During an average month in fiscal year 2024, around 1.5 million children and 569,600 adults received cash assistance through the program. *Id.* ¶ 30.

Each state seeking a TANF grant must submit a plan to the Secretary of Health and Human Services ("HHS") "during the 27-month period ending with the close of the 1st quarter of the fiscal year." 42 U.S.C. § 602(a). That plan must describe how the state intends to use the grant and must include criteria for the determination of eligibility, as well as various certifications, including that the state "is enforcing standards and procedures to ensure against program fraud and abuse." *Id.* § 602(a)(1)(A), (a)(1)(B)(iii), (a)(6). States must also certify that TANF benefits will "only go to 'qualified' immigrants, and in certain cases, that they have been in that

'qualified' status for five years." Compl. ¶ 36 (citing 8 U.S.C. §§ 1611(a), 1613(a), 1641).

When individuals apply for TANF benefits, state administrators require them to provide sensitive information such as "employment statuses, incomes, home addresses, marital status, Social Security numbers, and citizenship or immigration statuses" for themselves and each member of their household. *Id.* ¶ 43. The TANF statute in turn requires states to provide certain "disaggregated case record information" to HHS on a quarterly basis. 42 U.S.C. § 611(a)(1)(A). By regulation, the information states must share with HHS includes recipients' Social Security numbers, as well as their "amount of assistance received, educational level, employment status, work participation activities, citizenship status, and earned and unearned income." 45 C.F.R. § 265.3(b)(1). The Administration for Children and Families ("ACF") — the agency within HHS responsible for administering TANF — uses that data to generate annual reports to Congress. *See* Compl. ¶ 41 (citing 42 U.S.C. § 611(b)). ACF can also penalize states for, among other things, failure to submit required reports and failure to participate in income and eligibility verification. *See* 42 U.S.C. § 609(a)(2), (4). These penalties include reducing the grant payable to the state for the next fiscal year or quarter

and requiring the state to remit misused funds. *See id.* § 609(a)(1)(A), (2)(A)(i).

**B. The Privacy Act**

Congress enacted the Privacy Act of 1974 "[i]n order to protect the privacy of individuals identified in information systems maintained by federal agencies" by "regulat[ing] the collection, maintenance, use, and dissemination of information by such agencies." Privacy Act of 1974, Pub. L. No. 93-579 § 2(a)(5), 88 Stat. 1896 (1974). The Act prohibits agencies from disclosing an individually identifying record "to any person, or to another agency" unless "the individual to whom the record pertains" consents in writing or one of thirteen exceptions applies. 5 U.S.C. § 552a(b). One such exception is for a "routine use," *id.* § 552a(b)(3), defined as "the use of such record for a purpose which is compatible with the purpose for which it was collected." *Id.* § 552a(a)(7). Over time, federal agencies have announced various "routine uses" in the Federal Register. *See, e.g.*, System of Records Notice, 80 Fed. Reg. 17894 (ACF's April 2, 2015 notice of, among other things, new routine uses for TANF Data System).

Whenever an agency establishes or revises a system of records, it must comply with certain procedural requirements. Namely, it must publish a notice in the Federal Register that contains information including "the categories of individuals on

whom records are maintained," "the categories of records," and "each routine use of the records." 5 U.S.C. § 552a(e)(4). If an agency wishes to create a new routine use, it must provide notice at least thirty days in advance and "an opportunity for interested persons to submit written data, views, or arguments to the agency." *Id.* § 552a(e)(11). Finally, the Privacy Act requires an agency to "inform each individual whom it asks to supply information" of "the routine uses which may be made of the information." *Id.* § 552a(e)(3)(C).[2]

**C. Routine Use 10**

On June 23, 2026, the Office of Family Assistance within ACF published notice in the Federal Register that it intended to "mak[e] updates to" its existing system of TANF records. System of Records Notice, 91 Fed. Reg. 37406 (June 23, 2026), ECF No. 2-3 (the "TANF Notice"). The TANF Notice identified a new routine use ("Routine Use 10"), which would "authorize disclosures to [other] federal or grantee agenc[ies] or entit[ies] engaged by ACF (*e.g.* DHS or TANF program administrators) to assist ACF with program integrity reviews or projects, [and] to verify whether TANF grantee agencies are complying with TANF program requirements, including verifying

[2] The parties dispute whether and how that requirement applies in this case. *See, e.g.*, Oral Arg. Tr. 14:5-15:3, 72:24-73:23.

citizenship or immigration status." *Id.* at 37407.[3] It also indicated that the existing system of TANF records would be expanded to include "verification information obtained from [grantee] agencies, other HHS records, or other government entities . . . engaged to assist ACF with program integrity reviews or projects . . . ." *Id.*

The TANF Notice originally set July 23, 2026 as the effective date for Routine Use 10, as well as the deadline for the public to submit comments. *See id.* at 37406. But "an issue . . . prevented the public from commenting through the Federal eRulemaking Portal until July 10," so ACF extended the comment period and effective date for Routine Use 10 until August 11. System of Records Notice, 91 Fed. Reg. 45278 (July 20, 2026), ECF No. 2-4.

**D. The Instant Action**

Plaintiffs filed the instant action on August 3, bringing three claims under the Administrative Procedure Act ("APA"). *First*, plaintiffs allege that the TANF Notice should be set aside for failure to comply with the procedures required under the Privacy Act. Compl. ¶¶ 145-154. *Second*, they claim that, in issuing the TANF Notice, ACF acted beyond its statutory authority under the Privacy Act and in contravention of the

[3] Page numbers in citations to briefs, transcripts, and other exhibits refer to internal pagination.

Social Security Act. *Id.* ¶¶ 155-165. *Finally*, plaintiffs contend that the TANF Notice was an arbitrary and capricious agency action. *Id.* ¶¶ 166-176. Plaintiffs Common Cause and Make the Road States assert that, if Routine Use 10 is permitted to go into effect, their members will be "irreparably injured by [d]efendants' imminent sharing of their highly personal information." *Id.* ¶ 128.[4]

On August 4, before effectuating service on defendants, plaintiffs filed a motion for a temporary restraining order ("TRO") or, in the alternative, a preliminary injunction. *See* ECF No. 2. The Court denied the *ex parte* motion for a TRO and set a briefing schedule and argument on the preliminary-injunction motion. *See* ECF No. 7. At oral argument on August 19, the government represented that ACF had again delayed the effective date for Routine Use 10 — this time, until September 30. *See* Oral Arg. Tr. 80:3-8. Plaintiffs have advised that, to preserve the status quo, the Court needs to decide their motion by that date. *See id.* at 79:3-11.

## II. Discussion

A plaintiff seeking a preliminary injunction must establish (1) "that he is likely to succeed on the merits";

---

[4] Injunctive relief is available under the APA only when a "less drastic remedy (such as partial or complete vacatur . . .)" is insufficient to redress a plaintiff's injury. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010).

(2) "that he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "that the balance of equities tips in his favor"; and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the government is a party to a lawsuit, "the final two factors merge." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020).

The same standard applies to a motion to stay under Section 705 of the APA. *Nat Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 149 (S.D.N.Y. 2019); *accord E. Air Lines, Inc. v. Civ. Aeronautics Bd.*, 261 F.2d 830, 830 (2d Cir. 1958) (per curiam). Before applying this standard, however, the Court must first assess whether plaintiffs have standing. *See Murthy v. Missouri*, 603 U.S. 43, 49-50 (2024).

**A. Plaintiffs Have Standing**

Plaintiffs Make the Road States and Common Cause assert representational standing on behalf of their members — also known as organizational or associational standing. To invoke representational standing,

> an organization must demonstrate that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). "At the preliminary injunction stage . . . plaintiff[s] must make a clear showing that [they are] likely to establish each element of standing." *Murthy*, 603 U.S. at 58.

Defendants do not challenge the second or third elements of representational standing, which are satisfied. The interests that Make the Road States and Common Cause seek to protect are germane to their respective purposes. *See* Oshiro Decl. ¶ 8, ECF No. 2-8 (Make the Road States' mission); Young Decl. ¶¶ 7-16, ECF No. 2-7 (Common Cause's mission). And "individualized proof" is not required because plaintiffs seek "injunctive relief only, not money damages," *Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 150 (2d Cir. 2006), and resolution of their claims does not require "delving into individual circumstances." *Rent Stabilization Ass'n of City of New York v. Dinkins*, 5 F.3d 591, 596-97 (2d Cir. 1993).

The Court also concludes that the first element is satisfied. To establish that their members would have standing in their own right, Make the Road States and Common Cause must show (1) that their members "suffered an injury in fact that is concrete, particularized, and actual or imminent"; (2) "that the injury was likely caused by the defendant"; and (3) "that the

injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Here, the associational plaintiffs argue that Routine Use 10 will injure their members by "violating their statutory privacy rights, increasing the risks of misuse of their data and identity theft, and increasing the likelihood that potentially inaccurate information about them will be replicated across an untold number of federal, state, and private data systems." Pls.' Br. in Supp. of Prelim. Inj. Mot. 12, ECF No. 2-1. Defendants are likely correct that certain of these alleged injuries lie too far down the "speculative chain of possibilities" to satisfy Article III's injury-in-fact requirement. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). But "accept[ing] as valid the merits of [plaintiffs'] legal claims," as we must for standing purposes, *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022), the Court agrees with plaintiffs that the dissemination of their members' sensitive information to unauthorized individuals or agencies within the government constitutes an injury-in-fact.

The Supreme Court has held that, "with respect to the concrete-harm requirement . . . courts should assess whether the alleged injury to the plaintiff has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts," such as an "intrusion upon seclusion."

*TransUnion*, 594 U.S. at 424-25. "Invasion of privacy through intrusion upon seclusion . . . is a tort that occurs through the act of interception itself." *Caro v. Weintraub*, 618 F.3d 94, 101 (2d Cir. 2010). It "does not depend upon any publicity," but instead consists of "an intentional interference with [an individual's] interest in solitude or seclusion . . . of a kind that would be highly offensive to a reasonable man." Restatement (Second) of Torts § 652B (1977).

We agree with the Fourth Circuit's reasoning in a recent *en banc* opinion, which held that the Social Security Administration's allegedly unlawful attempt to share sensitive personal information with U.S. DOGE Service personnel "inflict[ed] a harm that [was] a close analogue to the common law tort of intrusion upon seclusion." *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 172 F.4th 361, 368 (4th Cir. 2026). "Much like rifling through someone's wallet, bank account, or personal documents, granting unauthorized and unwarranted access to a person's sensitive personal information is an intentional intrusion into private affairs or concerns." *Id.* at 369 (citing Second Restatement § 652B). "[U]nder plaintiffs' merits theory," HHS sharing TANF recipients' sensitive information with other agencies is no different from a psychiatrist "ask[ing] a patient to record their deepest, darkest thoughts and fears in a journal" and then

sharing it with the janitor employed in the same office. *Id.* at 370; *cf. Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 542 (2d Cir. 2024), *cert. denied*, 146 S. Ct. 880 (2025) (plaintiff had standing because disclosure of his personally identifiable information to an unauthorized third party for commercial purposes was "closely related to the public disclosure of private facts analog").

Defendants raise two counterarguments, neither of which is persuasive. *First,* they contend that Routine Use 10 is "not analogous to the types of conduct that have been deemed highly offensive to an ordinary, reasonable person" for purposes of the intrusion upon seclusion tort; instead, "the federal government is simply using federal-government information to carry out its legal responsibilities." Defs.' Opp'n 8, ECF No. 16. But, according to plaintiffs, that is not all defendants are doing. Rather, plaintiffs allege that ACF intends to share personal data with unauthorized entities *in contravention of* its legal responsibilities. Again, for purposes of standing, we must "accept as valid the merits of [plaintiffs'] legal claims." *Cruz*, 596 U.S. at 298.

*Second*, defendants argue that "like in *TransUnion*," plaintiffs "would generally have no reason to *know*" that their information has been shared. Defs.' Opp'n 8. But the plaintiffs there relied on an analogy to the tort of defamation,

which has a publication requirement, whereas "it is *the intrusion itself* that makes [a] defendant subject to liability" for intrusion upon seclusion. *Am. Fed'n of State, Cnty. & Mun. Emps.*, 172 F.4th at 370. Indeed, in two-thirds of the examples of intrusions upon seclusion that the Restatement provides, "it is never stated — and far from obvious — that the plaintiff is aware of the defendant's wrongful actions." *Id.* at 371.

There is no dispute that Routine Use 10 would be the cause of the claimed intrusion or that it could be redressed by a stay of the TANF Notice. Accordingly, we conclude that Make the Road States and Common Cause have standing.[5]

**B. Plaintiffs Have Not Demonstrated a Likelihood of Irreparable Harm**

Nonetheless, the Court denies the motion for a preliminary injunction because plaintiffs have not made a sufficient showing that their members will be irreparably harmed in the absence of injunctive relief. "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Accordingly, the Second Circuit has "frequently stated that a party seeking a preliminary injunction must first demonstrate that such injury

[5] We defer ruling on whether the Electronic Privacy Information Center has standing, as it has no bearing on the relief plaintiffs seek.

is likely before the other requirements for the issuance of an injunction will be considered." *Care One, LLC v. Nat'l Lab. Rels. Bd.*, 166 F.4th 335, 343 (2d Cir. 2026).

To demonstrate irreparable harm, a plaintiff must show that "absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). The last component of irreparable harm — the irremediable nature of the injury — makes it harder to prove than a mere injury in fact for standing purposes. The plaintiff must show that there is a "continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (per curiam).

As for the imminent risk that TANF recipients' sensitive data will be shared with unauthorized individuals, we again agree with the Fourth Circuit: while that is a cognizable harm for standing purposes, it is not an *irreparable* harm because (1) the Privacy Act "authorizes damages for intentional or willful violations"; and (2) "[t]o the extent that damages alone might not be enough, plaintiffs also fail to explain why a reparative permanent injunction would be legally inadequate to

remedy any lingering harm." *Am. Fed'n of State, Cnty. & Mun. Emps.*, 172 F.4th at 373.

*First*, money damages are available under the Privacy Act when an agency's intentional or willful violation of the Act has "an adverse effect on an individual" and that individual sustains actual damages. 5 U.S.C. § 552a(g)(1)(D), (g)(4). By making money damages the general remedy under the Privacy Act and only providing for injunctive relief under two narrow circumstances,[6] Congress strongly intimated that money damages *are* an adequate remedy for this type of violation. *Cf. Cell Assocs., Inc. v. Nat'l Institutes of Health, Dep't of Health, Ed. & Welfare*, 579 F.2d 1155, 1160 (9th Cir. 1978) ("We think it unlikely that Congress would have gone to the trouble of authorizing equitable relief for two forms of agency misconduct and monetary relief for all other forms if it had intended to make injunctions available across the board."). Indeed, the Supreme Court has left open the question of whether the Privacy Act permits plaintiffs to seek vacatur or injunctive relief under the APA at all. *See FAA v. Cooper*, 566 U.S. 284, 303 n.12 (2012); *see also* footnote 4, *supra* (injunctive relief permitted under the APA when vacatur would be insufficient).

[6] Those circumstances are when an agency refuses to provide an individual with access to his record or refuses to amend the individual's record in accordance with his request. *See* 5 U.S.C. § 552a(g)(2), (3).

*Second*, to the extent that money damages prove to be an insufficient remedy, plaintiffs could seek a reparative permanent injunction at the close of the case. *See Am. Fed'n of State, Cnty. & Mun. Emps.*, 172 F.4th at 373. That relief could, among other things, require specified agencies or entities to delete their copies of TANF recipients' data files. Because of this relief, courts in the D.C. Circuit "have consistently declined to find irreparable injury from the disclosure of private information where the challenged disclosure is not public, but instead is to a small number of individuals obligated to keep the information confidential." *All. for Retired Americans v. Bessent*, 770 F. Supp. 3d 79, 108 (D.D.C. 2025). While here, we may be talking about a small number of entities rather than a small number of individuals, the same principle holds: "the context of the dissemination matters." *Univ. of California Student Ass'n v. Carter*, 766 F. Supp. 3d 114, 121 (D.D.C. 2025).[7]

Plaintiffs argue that "it may be difficult or impossible to claw back the sensitive information" once shared.

---

[7] In a similar vein, the Second Circuit has said that "damages will often provide a complete remedy" for the misappropriation of trade secrets when "a misappropriator seeks only to use those secrets . . . without further dissemination." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118-19 (2d Cir. 2009).

Pls.' Br. in Supp. of Prelim. Inj. Mot. 27. As support, they point to a declaration that ICE recently submitted in another inter-agency data-sharing case in which it agreed to delete certain data it had received from the Centers for Medicare & Medicaid Services. *See* Pls.' Reply Br. 2, ECF No. 19 (citing Notice, *California v. HHS*, 25-CV-5536 (N.D. Cal. 2026, July 8, 2026), Dkt. No. 181-1); Oral Arg. Tr. 39:11-23. But the declaration does not establish everything plaintiffs say it does. Instead, ICE said that "technological difficulties" prevented it from "making a representation" to the court "that every possible variation of [a] file ha[d] been searched for and located" because "searches cannot capture the existence of all files where file names have changed, and even a single modification to the content of a file will impact [the] ability to locate it." Notice ¶ 24. But ICE certified that it had "never ingested the data," had processes in place to "immediately quarantine" and delete clawed-back material, was unaware "of any additional copies or versions . . . in existence," and would "make good faith efforts to delete any copies that may be found in the future." *Id.* ¶¶ 23-24.

The other injuries that plaintiffs allege are too remote to constitute irreparable harm. The TANF recipients' cited fears that they will be "the target of increased surveillance or even erroneously targeted by [ICE]" are vague

and speculative, especially when measured against the stated purpose of Routine Use 10. *See* Pls.' Br. in Supp. of Prelim. Inj. Mot. 25. Likewise, plaintiffs provide no factual support — other than their own say-so — for the proposition that the additional disclosures in Routine Use 10 will have a "chilling effect" on individuals who would otherwise seek TANF benefits. *See id.* at 26. Indeed, they do not explain the causal mechanism by which this chilling effect would emerge, even at the theoretical level. After all, TANF recipients were already willing to share this information with program administrators — and, by extension, ACF — to obtain benefits. Why the *incremental* sharing of TANF recipients' information within the federal government would have a chilling effect, plaintiffs do not say. Finally, plaintiffs do not explain why — or in what degree — "the risk undeniably increases that the information will be mishandled or subject to a data breach" when HHS shares it with other agencies, *id.*, or why that risk is imminent.[8]

[8] That final point is one way the present record is distinguishable from that in the two in-circuit decisions plaintiffs rely on in which the court concluded that intra-government information sharing amounted to an irreparable harm. *See Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 786 F. Supp. 3d 647, 679 (S.D.N.Y. 2025) ("OPM also disregarded its cybersecurity standards and protocols."); *New York v. Trump*, 767 F. Supp. 3d 44, 83 (S.D.N.Y. 2025) ("The Court finds that there is a substantial risk of future harm where the data access protocols in place do not satisfactorily vet the employees with access and rigorously train them in data security measures.").

Because plaintiffs have not demonstrated a likelihood of irreparable harm, their motion for a preliminary injunction is denied. *See Care One*, 166 F.4th at 343 ("Because the requirements are conjunctive, a movant must satisfy all three to secure a preliminary injunction.").[9]

## III. Conclusion

For the foregoing reasons, plaintiffs' motion for a preliminary injunction is denied.

SO ORDERED.

/s/ Eric Komitee
ERIC KOMITEE
United States District Judge

Dated: September 3, 2026
Brooklyn, New York

---

[9] We would also be remiss to ignore that fact that the Supreme Court stayed the district court's preliminary injunction order in *Am. Fed'n of State, Cnty. & Mun. Emps.* *See Soc. Sec. Admin. v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 145 S. Ct. 1626 (2025). While the Supreme Court's opinion there is brief, "we cannot ascribe to a Supreme Court decision no significance whatsoever." *Am. Fed'n of State, Cnty. & Mun. Emps.*, 172 F.4th at 376 (Wilkinson, J., concurring). And, applying a parallel standard to similar facts, the Supreme Court concluded that the Social Security Administration should be permitted to share agency records with DOGE employees during the pendency of the government's appeal of the preliminary-injunction order. *See Soc. Sec. Admin. v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 145 S. Ct. at 1626.